THE bill stated that in the month of December, 1807, Lewis Cameron was indebted to the Grand Lodge South-Carolina Ancient York Masons, in the sum of $5 1541, by bond payable to Paul Hamilton, grand master of the said Grand Lodge and his successors in office ; which bond was delivered over to W. L. Smith, one the complainants, who was the successor of the former grand master, with instructions to put the same in suit, and to pay the money, when recovered to the grand secretary. That at the same time there existed v Grand Lodge called the Grand Lodge of Soutli-Caroli-na Free and Accepted Masons, which held its meetings separate from the former, though the distinction was nominal. That the grand officers of both lodges, lamenting in common with the fraternity the schism which had split them, endeavored to promote a re-union. That on a proposition to unite them, committees of both Grand Lodges were appointed by the unanimous vote of both Grand Lodges, for the purpose of adjusting a plan tor the restoration of harmony, and for consolidating the two Grand Lodges into one; and after a friendly discussion, which demonstrated that there did not exist any material difference of system or principle between the two societies, a convention was signed re-uniting and incorporating the two societies into one masonic society, by the name of the Grand Lodge of South-Carolina. And the convention was, after due deliberation, *558 unanimously ratified by both Grand Lodges. That. w^ien ^te Grand Lodge of Ancient York Masons unanimously assented to this act, it consisted of the repre-scntatives and proxies of a large proportion of the lodges under its jurisdiction, and several of the present (jefen(|an(;s Were present and made no objections. That two societies had been previously severally incorpor-a^et^ by different acts of the legislature; and it was agreed that an application should be made to the Iegis-thelature to repeal those acts, and to pass another general act incorporating the Grand Lodge of South-Carolina. application was made, but the legislature did not then pass the desired act. That some time after certain individuals, who had concurred in the re-union, became, dissatisfied therewith 5 and induced some of the country* lodges to join and form with them a masonic society by the title of Grand Lodge of South-Carolina Ancient York Masons, contrary to the constitution of regular masons. That the new Grand Lodge of South-Carolina endeavored to satisfy the scruples of the seceders by repealing the obnoxious regulations ; notwithstanding which the seceders proceeded to pursue hostile measures. That the attornies of the Grand Lodge had obtained judgment against L. Cameron and bis sureties, and were about to recover the debt due by him, when an order was privately obtained from one of the Judges of the Court of Common Pleas, for changing the attornies and substituting another who was subservient to the. views of the present defendants ; and was about to procure payment of the money, for the benefit of the sece-ders, though the funds belong of right to the complainants, as grand officers of the Grand Lodge of South»Carolina, the said funds having arisen from contributions of the subordinate lodges, a majority of which constitute and compose the Grand Lodge of South-Carolina. That being apprehensive of the payment of said debt to the defendants, the complainants pray for an injunction, and for a decree establishing their right to the funds in question.
*559 ~The defendants in tlieir answer admitted the complai-•iiants’ statement of the debt due by Lewis Cameron, and the various steps taken relative thereto j and they mit the existence of two separate Grand Lodges as stated j but they deny that the distinctions between them are nominal, or that they were governed altogether by the same rules and principles j that on the contrary the forms of admission, and the modes of carrying on work in the two Grand Lodges are essentially different; and that members of the Lodges of Free and Accepted Masons,could not be admitted in to the Lodges of the Ancient York Masons, except in the manner practised on the admission of other candidates. That to do otherwise' would be to violate the obligations and remove the land marks of the Ancient York Masons.
The defendants admit the steps taken to effect an union of the two Grand Lodges ; but they deny that the convention which was agreed upon by the committees of the two Grand Lodges was ratified regularly; that some of the defendants made objections, but were told that the modern or Free and Accepted Masons would be regularly made Ancient York Masons in the customary forms ,• with which answer they were satisfied. But afterwards finding that was not the effect of the convention they opposed it. And the St. John’s Lodge No. 31, a portion Of the Ancient York Masons, were unanimously of opinion that the same could not be legally carried into effect, and instructed their representatives to get the same repealed ; particularly the seventh' article of the convention. And they accordingly attempted to obtain a repeal in the Grand Lodge ; hut without effect. That although it appears that the convention was ratified by the representatives and proxies then present $ yet in fact a majority of the proxies voted in opposition to the wishes of their constituents, who had not been previously notified of a measure of such importance to the Grand Lodge of South-Carolina Ancient York Masons, and which required their special instructions and approbation before its adoption,
*560 The defendants admitted that thé two old Grand -^°^SCS were attempted to bé united, as alleged by com* piainants and they admit the measures taken to procure a new act °1? incorporation, which Was not obtained from the legislature, because it was informed that a majority of the Lodges constituting the Grand Lodge of South-Carolina Ancient York Masons disapproved of the measure, on account chiefly of the 7th article of the convention. That a majority of the said Lodges called a convention in May, A. D. 1809, (of masonry 5809,) at which a majority of the Lodges were represented | and the complainants and their confederates were expelled from the Grand Lodge of Ancient York Masons, and they were declared to have forfeited the rights and advantages resulting to them by the act of incorporation ; and that the defendants and their associates were entitled to all the benefits and advantages of said incorporation.
The defendants deny that they have formed a new' Grand Lodge, and aver that they have only re-organiséd and perpetuated the Grand Lodge of South-Carolina Ancient York Masons, agreeably to thé established rules and conformable to their charter.
Defendants admit that they took measures to secure the said debt due by L. Cameron to prevent its getting into the hands of the complainants, who were seceders, and having formed a new Grand Lodge, under a new title, not known in the charter, were not entitled to the Same.
At the hearing of the cause, the act of incorporation was produced in evidence by which it was enacted, that the grand master and others, the officers arid members of 18 Lodges of Ancient York Masons, represented in the Grand Lodge of Charleston, (who hajl petitioned to be incorporated) should he and become a body politic and corporate, by the name and style of the Grand Lodge of the state of South-Carolina Ancient York Masons) and its masonic jurisdiction j and that the said society and the lodges constituting the same, should have power *561 !x> receive, purchase and retain property$ to make by e-laws, to constitute subordinate lodges* and to do all other things concerning the government, estate, monies and revenues of the said Grand Lodge and subordinate lodges.
The proceedings of the different lodges were then produced to shew the steps which had been taken towards an union. By the fourth of the articles drawn up for the union of the two societies, it was agreed that the oath and form of initiation, together with the form, of working shotdd be hereafter the same in all the lodges, under the direction of a committee of inspectors to be appointed as soon as convenient, after the passing the new act of incorporation; until when, all the lodges should initiate according to their respective usages. By the fifth article it was agreed that as soon as the new act of incorporation should be passed, the grand masters of the present Grand Lodges should summon their respective bodies to assemble in convention to elect grand officers and organise the Grand Lodge of S. Carolina ; and by the sixth, the grand officers of the. present and past masters of the subordinate lodges, should, at the first meeting of the Grand Lodge of South-Carolina, after the act of incorporation should be obtained, appear in the said Grand Lodge and take the customary oath of secrecy 5 and the masters of the subordinate lodges should afterwards administer the same to their officers and members. By the seventh article, brethren, from foreign lodges taking the customary test and entering into an obligation not to reveal any part of the mysteries, .should be admitted without regard to their being Ancient or Modern, which names of distinction should thereafter Cease.
This agreement of the Committees of the two Grand. Lodges, appears to have been accepted and confirmed at a meeting of the Grand Lodge of Ancient York Masons on the 24th September, 1808, (5808,) and a committee was directed, in conjunction with the committee of the Grand Lodge of Free and Accepted Masons, to *562 petition the legislature for a new charter, and to carry ^ie ag1>0eilieiR into' effect, and to transmit to the masters of the lodges under their jurisdiction copies of the con-ventio'n. Application was accordingly .made to the legislature for a new act of incorporation 5 but the prayer 0p tj10 petition was not then granted, and no act was then passed. Nevertheless the two Grand Lodges assembled in Dec. 1808, (5808,) and deliberately proceeded to carry the convention into effect, by electing grand officers of the Grand Lodge of South-Caroliná, and by appointing committees to give effect to the system. The committee reported a test oath which was adopted, by which every member was required to swear not to reveal the secrets of Free Masonry, and to observe and obey all the orders and decrees of the Grand Lodge of South-Carolina.
The rules and regulations of the Grand Lodge of Ancient York Masons and the several lodges under its jurisdiction were produced in evidence, as well as the A-him an Rezón of Dermot, and the Ahiman Rezón of Dr. Dalcho, both which were admitted to be books of authority. In Dermot’s Ahiman Rezón it is stated that « there is a great difference between Ancient and Modern Masons.” In Dr. Dalcho's Ahiman Rezón the supremacy of the Grand Lodge and its power to ordain and establish such rules as it thought proper is repeatedly asserted, with proviso that the new rules did not lend to remove the ancient land marks of the craft, to abolish useful ceremonies, or to introduce any that are new or improper.
Other documents were produced to prove the dissatisfaction of several of the members of the Grand Lodge, and of eighteen of the subordinate Lodges, who concurred in disapproving the conduct of the Grand Lodge of Ancient York Masons, as unmasonic, as an abandonment of the principles of the craft, and as removing land marks. Letters were produced from the Lodges of Ancient York Masons ip-Georgia, North-Carolina, "*7 irginia. Maryland, Pennsylvania, Tennessee ami Ken- *563 tucby disapproving the conduct of the Gránd-Lodgc South-Carolina Ancient York Masons, declaring that they had departed from the ancient rules and land marks of masonry.
The proceedings of the Grand Lodge of Ancient York Masons at Columbia were produced, by which it appeared that sixteen lodges were represented, who dissented from and censured the conduct of the Grand Lodge, and expelled the members of it; and that a re-election of grand officers of the Grand Lodge of the Ancient York Masons took place ; so that the same was re-organised, according to the ancient constitution, and they are the defendants in this suit.
The complainants produced the abstract of the books of the Grand Lodge to shew that the funds were produced chiefly by the Lodges who concurred in the new arrangements, and who adhered to the new Grand Lodge.
The complainants also produced an address of the grand convention of the Grand Lodge at Baltimore, approving the conduct of the Grand Lodge in S. Carolina.
The defendants called a number of respectable witnesses, entitled to full credit, who deposed that they had. been Ancient York Masons, and that in their opinions Modern Masons could not be admitted nor initiated without going through the ancient ceremonies. That to admit them merely on taking a test oath, was a departure from rules and principles, and removed land marks. And that the differences between the Ancient York Masons and Modern Masons were material; and •that the Moderns did not know the secrets of the Ancients.
On the other hand the complainants called a number of respectable witnesses, fully entitled to credit, who deposed that they were well acquainted with masonry, and that some of them had taken high degrees in the craft. That the Ancient York Masons could visit the Moderns, but not vice versa ; that they considered the differences as formal, trifling and unessential $ that *564 there was nothing in the constitution of the Ancient Yorks which forbade such an union as took place on modifying the rules of the society ; and that admitting the Moderns merely on taking the test oath, was dispensing with some ceremonials; but there was no dere-jjctjon 0f principle or removal of land marks ; and that the mode of working is essentially the same among both ; that the test oath was intended to secure secrecy and was binding on Ancients and Moderns ; that the words and signs are the land marks of masonry ; that the supreme power was in the Grand Lodge, and that the subordinate lodges were bound to obey the orders and decrees of the Grand Lodge ; but that the Grand Lodge itself could not alter the land marks. They did not think land marks were altered by the terms of the union,
otoííee.
The Court in delivering its decree, stated, that it was under the peculiar disadvantage in this case, of being obliged to take opinions instead of facts, as the witnesses on both sides declared they could not disclose facts, consistently with their obligations as masons. To weigh opinions is one of the most difficult tasks which can be undertaken. In the relation of facts, discerning and honest men often disagree, yet the Judge or the Jury have some land marks to guide them. B ut in the con* flict of opinions, how difficult is it to ascertain how much is the sober result of impartial examination, made with a sound judgment, seeking the truth alone, or how much is the result of passions and prejudices acting on a weak judgment, and credulous temper. I am aware of the difficulty of my situation. It has induced me to examine this case with uncommon deliberation and attention 5 and if I should be mistaken in my judgment, I have the consolation to know that it ns ay be corrected.
Before I proceed to the argument on the questions which arise on the case, it will be proper to take a view of the actual situation of the Lodges under the jurisdiction of the Grand Lodge of Ancient York Masons, at the time of its adoption of the plan which lias unhappily *565 .produced such discords,' as well as at the period. At the extra meeting on the 9th July, 5808, there were present fourteen Lodges of which ten were represented by their proper officers, and four by proxies. At the stated meeting on the 24th September, 5808, there were present twenty eight Lodges of which fifteen were represented by their proper officers, and thirteen by proxies, of which col. John Mitchell, had eight in his own hands, Mr. Richards four, and Mr. J. H. Stevens, one. At the stated meeting on the 17th December, 5808, there were present twenty-nine Lodges, of which twelve were represented by their proper officers, and seventeen by proxies, of which col. John Mitchell held nine in his hands, Mr. Richards four, Dr. Dalcho two, Mr. Cudworth one, Mr. J. H. Stevens one. At the meeting which took place at Columbia, which declared against the proceedings of the Grand Lodge of Ancient York Masons as unwarranted, and removing land marks, there were present sixteen Lodges, ten of whom had been represented in the Grand Lodge of Ancient York Masons at the time of these proceedings; but who declare, that they had no notice of these intended alterations from their proxies, and gave no instructions, and disapproved of their conduct. And they expelled the officers ©f the Grand Lodge who had made the alterations which they deemed a removal of land marks. It seems that only two of the country Lodges which were under the jurisdiction of the Grand Lodge of Ancient York Masons, have concurred in and finally adhered to the alterations which were made on the 17th December, 5808 ; but that ten Lodges resident in the city, have consented to the alterations, and do adhere to the new Grand Lodge of South Carolina, for which they have been expelled by the Lodges who have reorganized the Grand Lodge of South Carolina Ancient York Masons. After this detail of the proceedings in this case, we come now to consider the questions made for judicial decision. The first question which arises is, whether the Grand Lodge of Ancient York Masons *566 has such absolute power by the constitution and prin-c*l^es °f masonry, as to warrant the acts which it has done, supposing those acts have removed the land marks 0f the craft? The second request for consideration is, whether the act done by the Grand Lodge, did amount t0 a breach of the fundamental rules of the order and remora! of the land marks ? The third question is, whether, the subordinate Lodges were not so represented, and did not so consent to the act done in the Grand Lodge as to bind them even if the act removed land marks : Fourth, whether any part of the act done by the Grand Lodge of Ancient York Masons, were inconsistent with the chartered rights of the society, and with the law of the land respecting corporation. Fifth, what were the legal effects of the act of the Grand Lodge as to the charter itself? As to the individuals composing the Grand Lodge ? And as to the subordinate Lodges which did not finally accord with the Grand Lodge in its measures. Sixth, can the individuals who have formed a new voluntary association, bring suits under their new name, and support claims under the old rights of a chartered body to which they originally belonged.
A good deal of ingenious ai’gumcnt was urged, respecting the absolute rights of the Grand Lodge which farm the subject of the first question. Several passages from the Ahiman Rezons were quoted to prove the supreme unqualified power and authority of the Grand Lodge, to make and alter laws and regulations; to abolish them and replace them by others ; and all this without controul, or appeal even (as is said by the counsel) to the Courts of Justice. I have examined the books, I mean Dermot’s and Dalcho’s Ahiman Rczons, from one end to the other, as well as the particular rules of the Grand Lodge of Ancient York Masons, to ascertain this point; and I do indeed find many very strong passages which assert the supremacy of the Grand Lodge over the subordinate Lodges; but after all, it is not easy of belief that any set of reasonable men, and least of all *567 the citizens of a free country, should consent to bind themselves so absolutely and irrevocably under the power of others, but that some reservation must have been intended ; and in reality, we perceive plainly by these very books of authority, that there is a limit to this power. In the first place we find the expression of a constitution repeatedly used, which implies some fixed principle independent of ordinary legislation. We also find, that in the Ahiman Re-zón of Dalcho, when the master of a lodge is installed, he is called upon to swear implicit obedience to every edict of the Grand Lodge of Ancient York Masons, that is not subversive of the principles and ground work of masonry ; thus manifestly referring to, and recognis-ing some principles and ground work, sacred and not subject to be altered or effected by the edicts of the Grand Lodge itself. And so in page 191, ’2, of the same work, in the preamble to the rules for the government of the Grand Lodge of Ancient York Masons, the right to establish a Grand Lodge in this state, is asserted, with power to ordain and establish such rules . for their future government, as suited them j provided they did not tend to remove the ancient land marks of the craft, to abolish useful ceremonies, or to introduce any that are new or improper. Nor was this limitation to the absolute power of the Grand Lodge, anew principleintro-duced into the regulations in this country, from the tendency which all private societies have to conform their principles to those of the government under which they live ; for we find the same laid down as a fundamental principle in the Ahiman Rezón of JDermot, framed under a monarchical government, and actually expressed more fully. In the 2fth rule, page 84 of Dermot, it is stated that every Grand Lodge has an inherent power and authority to make new regulations, or to alter these for the benefit of the ancient fraternity, provided always, that the old land marks be carefully preserved ; and that such new regulations and alterations be proposed and agreed to by tire Grand Lodge. And that they *568 °®3re^ ^10 Perusa^ the brethren in writing, approbation and consent, or a majority thereof, ts absolutely necessary to make the same binding and obligatory. If it were necessary to add any thing to these authorities or to resort to individual testimony, it may he said that so me of the strongest witnesses for th® complainants, expressly stated that no Grand Lodge could remove the land marks of the craft, notwithstanding its great powers. Thus we find a perpetual recur* rence to certain fundamental principles and land sharks which the Grand Lodge itself could not disturb or remove. And this is consistent with the very nature of free masonry, which professing to he founded on th® broadest principles of charity and benevolence, and to embrace the whole human race, and to be in connexion with the brethren all over the world, could not maintain that connexion without adhering invariably to certain immutable principles, and practising certain forms and ceremonies common to all and unchangeable by any. The acts of the Grand Lodge of Ancient York Masons now under consideration cannot'then' he defended upon the mere ground of supreme authority, empowered to alter or add to the system what it pleased, without regard to principle or land marks. The counsel for the complainants therefore, judiciously took another ground* to wit: that the acts done by the Grand Lodge, were ■ not inconsistent with the fundamental principles of n^a-sonry, and removed none of the land marks of the craft, which forms the second question for the consideration of the Court. The sources to which we must resort, for light to guide us in forming a judgment on this question are the following, to wit: the Áhiman Rezón or book of authority among masons 5 the rules and regulations of the society of South-Carolina Ancient York Masons 1 the parol evidence, 0? rather the opinions given in the cause ; the opinions of the lodges in this state, and the opinions of the Grand Lodges in the other States of A-meric». It is unnecessary to repeat in detail the principles stated, and the provisions contained in the AM- *569 mam Rezón, and tbe rules of the Ancient York Masons; but it does appear to me, that they treat as fundamental points, and consider as land marks those things which the Grand Lodge have assumed upon themselves to change, by which it seems to me they have violated those principles, and removed those land marks. These acts may be summed up in a few words. The Grand Lodge formed and executed a plan to alter the existing state of things in the society, without special authority from the subordinate lodges to their representatives, to agree thereto ; and without their knowledge, their representatives acting only under ordinary powers, which had no view to such alterations. They admitted into the society, without the usual forms and ceremonies, all the members (who would take a new test oath devised for the occasion) of another society of masons who according to the Ahiman Rezón of Dermot, differed in essentials from the Ancient York Masons | and they thus disscfv-’ ed the old society, and formed a new one, which was am amalgamation of the Ancient York Masons, and th® Moderns, under a new name; and they formally abolished the old name of the society. By these acts, the wall of separation which previously existed between the two societies was broken down, without regard to those differences which for a long time subsisted and seemed at least (in whatever they consisted) to have been considered by the two societies as essentials. The imposition too of a new test oath, on the old members of the Ancient York Lodges, which obliged them to a promise of implicit obedience to the future regulations of the Grand Lodge of South-Carolina, and the refusal to admit those of them who refused it, seems to me to have been a strong act, inconsistent with their rights under their constitution and rules. And the oath itself is subject to great objections, as it required obedience not to the principles of masonry, known and established, but to ali such future regulations as should be made by the new Grand Lodge; winch is the imposition of an obligation, almost without example. If we proceed to the parol testimo^ *570 «y, or rather the opinions given in the cause as to th« materiality of the differences which subsisted between two sects of masons, and of course to the legality 0f the acts of the Grand Lodge, we feel rather embar-than satisfied. ■ For we find respectable and in» telligent pten, skilled in the mysteries of masonry, and entirely worthy of credit, differing totally in opinion# The witnesses for the defendants attesting that the differences between the two sects were material, important and affecting land marks 5 consequently not within the power of the Grand Lodge, to remove by a short hand, or by such proceedings as took place. Off the other hand, the witnesses for the complainants attested that these differences were immaterial, trifling, and not worth a pinch of snuff •, consequently removable by the Grand Lodge without altering land marks. The scales thus poized by such opposite testimony, or opinions, would have hung in suspense, if we had not other guides to our judgment. But I cannot avoid remarking that where such differences of opinion existed, as to the constitutional or fundamental point, it would have been safest not to act j and the tranquility and harmony of a band of brothers would have been best preserved by respecting the scruples of those who believed that the changes contemplated would affect vital rules or principles*. Such conduct in those who zealously, andT am sure honestly, sought an union of different sects, might have prevented the discords and schisms which have taken place in their own sect. The declarations of many subordinate lodges go to strengthen the opinion I have formed that the measures of the Grand Lodge and the alterations made by them were vital, and did affect the rights, interests and principles of the Ancient/ York Masons. it is true, they are parties to this controversy, and if the matter rested on their opinions alone, it would not be conclusive. Opposite-opinions of other respectable lodges would have equal weight. But we are seeking for information, and we are obliged to resort to opinions for that information ; and when we perceive a majority of *571 ..fbe lodges in this state, made hostile to the Grand Lodge (which they previously reverenced as tiieir head) on account of an alleged departure from the land marks the order, it adds strength to the other testimonies on this subject. The immateriality of the differences could not be clear, when so many of the skilful doubted or denied it. Nor is this all. A number of Grand Lodges of Ancient York Masons in other states have been consulted, and a great majority of them have pronounced that the proceedings of the Grand Lodge of Ancient York Masons were a clear departure from the principles of the craft, and a removal of the land marks. This appears to me to be very weighty — skilled in the mysteries of the craft, and unprejudiced as to the parties, their opinions must be entitled to very high consideration». St is said the Grand Lodges are not unanimous in their opinion $ this is true, but the majority are of that opinion ; and in matters of opinion, the presumption of right is with the majority, at least when it is considerable j and the Court can have no better guide in such a. case as this. Against this it has been stated that similar reunions of the Ancient York Masons and Modern Masons have been made in England, and elsewhere $ and this is used as presumptive evidence of the regularity and correctness of the proceedings here. But we have »ot learnt whether these re-unions were effected in the manner this has been done ; or whether the Moderns were regularly re-made, and with the full assent of the Ancient Yorks. Upon the whole I feel myself bound to declare that so far as I can form an opinion on this subject, the alterations and arrangements made by the Grand Lodge of Ancient York Masons, did remove what were most generally considered land marks of the craft, and that this exceeding the powers of the Grand Lodge, the subordinate Lodges were not bound by those acts, unless it be found that they regularly and understandingly assented and adhered to the alteration. This leads us to consider the third question, whether the subordinate Lodges were not represented, and did not sp *572 consent to the acts of the Grand Lodge as to he hound hy them, even if those acts removed land marks ? A number of the Lodges were represented undoubtedly by their proxies in the Grand Lodge, at the time that these transactions took place. But I think it is of great inl-portance ¡n this question that there were no special powers given to these proxies, and that one proxy representing a number of Lodges was allowed hut one vote. No formal notice was given to the Lodges of any material changes being in contemplation, andf there is no evidence that any kind of notice reached the subordinate Lodges in the country, of what was passing, till after the ratification of the convention on the 24th September, 5808. It is not known that even the subsequent letter of the grand secretary of the 4th October, 5808, giving notice of the plan being ratified on the 24th September, ever reached the subordinate Lodges, so as to give them an opportunity to express their dissent, prior to the 17th December, 5808. When the Lodges granted these proxies Jbey gaye them for ordinary purposes, and to sup-. j>ort, not to destroy, the system of Ancient York Masons ; yet a radical change is attempted, and carried into operation, as far as it could be done under that authority, without consulting their constituents. But it is insisted that the Lodges were represented and bound by the assent of their delegates, I confess it does appear to me, that when so fundamental an alteration was un-. der discussion, it was reasonable, and according to the rule in Dermot’s Aloman Rezón, that all the brethren should be consulted on great occasions ; that the subordinate Lodges should have been informed distinctly of what was doing, and should have had an opportunity of instructing their representatives what course they preferred on this occasion; and that not having had this opportunity, they were not bound by the acts done by the Grand Lodge, on this vital question, though their proxies acting under ordinary powers, assented to them. .But if we admit that notice had reached the subordinate Lodges of the convention, v/hfoh had been agreed on *573 and ratified in time to have enabled them to oppose them before the 17th 'December, 5808, it is obvious that the terms of that convention were conditional. Every thing was made to depend upon the attainment of a new charter, and they had a right to expect that nothing further would be done, if the new charter was not obtained. Yet on the 17th December, 5808, the Grand Lodge resolved to give effect to the convention without waiting for the new charter which had been agreed to be the basis of the new system. And it proceeded to give full and final effect to the convention, to the entire abandonment of the old system, even to the very name of the society. It does strike me that the subordinate Lodges! •were not so represented for this special and extraordinary purpose, as to bind their assent to the acts done. ; And that if entitled to be consulted at all, as I think they were in all vital changes, there ought to have been a special notice of the contemplated alterations, being fundamental, that they might have sent a special representation, with proper instructions, to speak their sentiments. This was not done, and I do not hold them, bound. They were at liberty to dissent, and a majority of the Lodges have dissented ; and only two country Lodges adhere. We come now to the consideration of the fourth question, in this case, whether any part of the acts done by the Grand Lodge were inconsistent with the chartered rights of the society, and with the law of the land respecting corporations ? We have heretofore considered the question as if it had related to a mere voluntary association, which was governed solely by its own rules and bye-laws, which formed a code for its own government, independent of any charter and the laws of the land. We must now look at it as a corporate society, and examine the act of incorporation, and test its conduct by that charter. By that act it appears that upon the grand master and others, the officers and members of the eighteen Lodges of Ancient York Masons, represented in the Grand Lodge, and then forming a voluntary society, petitioning the legislature to be incor- *574 as a body politic,'“ it was enacted that the sa& ciety above mentioned, and the subordinate Lodges composing the same,” and their successors were declared to ke a body politic and corporate, by the name of thé Grand Lodge of the State of South-Carolina Ancient York Masons and its masonic jurisdiction, and that “the said society and the Lodges constituting the same,” were made capable in the law to purchase and hold property ; and to sue, or to he sued, in any court of law or equity in this state, and to make such rules, orders and bye-laws (not repugnant to the laws of the land) as might be necessary for the order, rule and good government thereof; and it was made lawful for the said society to constitute Lodges and to do all other things concerning the government and estates of the said Grand Lodge and subordinate Lodges. By this act it appears that the subordinate Lodges were a constituent part of the society so incorporated. We must now look to the laws of the land for the rules which are to govern the- * conduct of this incorporated body. . One of the funda-j.mental rules of corporate bodies is, that the members | are not to do any act which may destroy its existeneg, ¡®r,injure its privileges, If any members do any such ■acts as are detrimental to the corporation itself, or to ;some of its liberties, privileges or franchises, such as 'burning or erasing the records, attempts to destroy the charter, &c. they are subject to be removed for such acts, 11 Co. 99 ; 1 Bun. 399 j and that whatever js done,, shall, according to the English law, be by the consent, of. the majority of the corporate body, though the civil law required the assent of two thirds of the corporate body. ‘3Sy recurring to the convention agreed to by the Grand Lodge, on the 24th September, 5808, it appears that the very object of the convention was to dissolve the then existing corporation, and to form a new one, partly with the old, and partly with hew materials ; fpr which, a new charter was to be obtained ; and that though the new charter was not obtained, the Grand Lodge proceeded to carry into effect the convention as far as they *575 could, and to declare the old system abolished, and the new one established, and they never after met as a Grand Lodge of Ancient York Masons. We have already amined the question, whether the subordinate Lodges, who formed a constituent part of the corporation, were So represented in the Grand Lodge, as to be parties to this deliberate attempt to dissolve the old corporation, and we have expressed our opinion that they were not So represented. Could the individuals then, who composed the Grand Lodge, give up the charter which covered the whole body of Ancient York Masons by their act ? This subject has been much discussed. In the time of Charles the II. when a profligate and tyrannical government found it necessary to vacate the corporations in England in order to mould them to its purposes, hold and cunning attempts were made on the corporate officers of London, and most of the corporations in England ; many of them were surrendered by the pusillanimity of the officers, and that of London was declared to be forfeited, with some others, who would not voluntarily surrender the charters. The arguments against the validity of the voluntary surrender by the officers appear to be very powerful 5 it was said that those who were in the government of corporations, and had their charters and seals in keeping, were not the masters or proprietors of those rights ; they could not extinguish those corporations nor part with any of their privileges ; the charters were sacred trusts which could not be given up at the will of the officers, who only had a temporary administration, not a property in the charters ; nay that crimes committed by corporation officers, were mere personal things which were only chargeable on those who committed them, but could not affect the whole body. These arguments had no effect at the time when a wicked government and dependent judiciary decided arbitrarily; for at that time the judges held their Commissions at the pleasure of the crown, and were miserably submissive to its dictates, as the least resistance-produced a dismission $ but afterwards at the revolution^ *576 parliiiment and the court acknowledged these principies"- and reasonings to be valid ; declared the surrender and the judgments of forfeiture to be void, and the charters were all restored and new sanctions enacted to guard them from future surrenders. See Burn. His. of his own ,. m , , ,, time, and Bac. 31, 2. To apply this to the present case*The officers and members of the great Society of Ancient York Masons assembled in Grand Lodge, agreed to surrender or abandon the charter, under which the subordinate Lodges were incorporated, as well as the Grand Lodge, and to accept a new charter; and upon that not being obtained, they formed themselves into a new voluntary association with a new name, and actually carried their plan into effect, as far as in them lay, and declared the ancient system and name abolished and extinguished; but without any regular assent on the part of the subordinate Lodges, except that which was said to he implied by the vote of their proxies# which we have decided not to be binding in such an extraordinary case. Upon the best consideration I have? been able to give this question, in does seem to me, that these acts done by the Grand Lodge, were inconsistent with the chartered rights of the society, and with the law of the land respecting corporations. My great respect for the intelligent and excellent persons concerned in these acts, made me long hesitate before I came to this conclusion, but I find myself irrésistably driven, to it. This leads to the inquiry under the fifth question : What are the legal effects of the acts of the Grand Lodge ? 1st. As to the charter itself, 2d. As to the subordinate Lodges, which did not accord with the Grand, Lodge in its measures. 3d. As to the individuals composing the Grand Lodge. 1st As to the charter itself. Among the methods by which corporations may be dissolved, that of a surrender is enumerated in the law books, and doubtless when the whole body ofacorpor-ation chooses to surrender its rights, it is at liberty to do so, and it will be valid; but a majority must concur who have an interestor a right. The officers of a cor- ’ *577 poration, or-an integral portion of it, as wc have before stated are not the corporation, they have no right to make the surrender, and if they make the attempt, by an act, or declarations, it is an inefficient act, it is not obligatory on the corporation, which retains its rights, existence, and legal character. In the present case, the Grand Lodge, which by charter, is only one .of the component parts of the corporation, intended, as has been repeatedly stated, to surrender, and actually declared their dereliction of the charter, and pronounced the society extinct, and a new one formed by a new name; and the individual members who then composed the Grand Lodge, have never assembled again under the charter. But the subordinate Lodges being also component part of the corporation by the very terms the charter, and ajmyo£ity of those Lodges having never regularly assented to the act of dereliction or surrender, in their distinct Lodges, either by themselves or by their representatives, properly authorised for such a purpose, in my opinion the surrender or dereliction of the charter by the officers composing the Grand Lodge, was not such a surrender as extinguished the corporation ; their act was invalid ; and the corporation remains in full force, life and vigor, in possession of all its rights. The charter not being forfeited, in my opinion, it might seem to be unnecessary to notice the argument, that if the acts of the Grand Lodge amounted to a forfeiture, it was fatal to all the claimants. But I will make a few remarks thereon. In the first place — if this were true in the extent stated, then it is obvious that the complainants even if they had used the old corporate name, could not have sustained this suit, and their bill must have been dismissed,'whether the defendants had any right or not. Again : The law indeed seems to be settled as a rule, that where a corporation consists of several integral parts, if one of these become extinct, (2d Bacon, 31,) whether by the death, of the persons of whom it is composed, or by any other moans, the whole corporation is dissolved. For though *578 this was doubted in the case of Colchester vs. Seaber, (3 Burr, 1866,) yet in the later case of the King vs. ^assmore’ 3 Term Rep. 199, it was decided that when an integral part of a corporation is gone, and the corporation hath no power of restoring it, or of doing any corporate act, the corporation is so far dissolved that the king may grant a new charter to a different set of men. The qualification in this judgment is very important. "Where the corporation has no power of restoring the integral part which is gone, then the corporation is so far dissolved that the king may grant a new charter to a different set of men; but if the corporation has the power of restoring that portion of it which is gone, then the corporation is not dissolved. And I do apprehend even if it be admitted, for the sake of argument, that the dereliction of the Grand Lodge put an end to that branch of the corporate body, that the remaining part of the corporation, to wit, the subordinate Lodges, liad the power of restoring the integral part, which by this argument is supposed to be gone. In most cases it would be presumable that corporations have the power of supplying defective members, to prevent the death of the whole body. It is the genius of our law to preserve rather than destroy, to lend its aid to maintain rights rather than suffer them to perish. But there is in this case a renovating power, apparently inherent in the very organization of the masonic system. The Grand Lodge however powerful when formed, grows out of the subordinate Lodges. It is composed of past-masters and other officers of the subordinate Lodges ; they must have subsisted before a Grand Lodge could be formed, though when formed, the Grand Lodge erects new subordinate Lodges. Who formed the Grand Lodge of Ancient York Masons originally in this state after the war i A certain number of Lodges then existing, who agreed to unite together and to form a Grand Lodge. The right of individual Lodges not less than five in number, to form a Grand Lodge in any state or community, where none is in legal existence, is asserted from Dermot down *579 Co Dr. Dalcho’s Ahiman Rezón, and if the Lodges could create a Grand Lodge, as they did after the war, they surely could renew one, which the officers and members had left vacant by dereliction. I think therefore the' Lodges could lawfully restore or renovate the Grand Lodge on the abandonment of the officers who composed it, though we should admit that the act of abandonment had amounted to a temporary extinction of an integral part of the corporation. But I should have very great reluctance to decide that the dereliction of station or abdication of any officers of a corporation, or even a distinct branch of an extensive corporation, amounted to such an extinction of an integral part of the corporation, as would jeopardise the body corporate. It would be very mischievous to do so. The charters of all our towns, and of all our societies, might be jeopardised by any leaning of the Court to construe the acts of portions of corporate bodies as extinctions of their charters. This is not the policy of our country. We have nothing of the jealousy against corporate bodies which Trajan expressed in his celebrated letter td Pliny, when he consulted him as to the formation of an useful one in his province. We know their value, and cherish them as useful engines for great purposes in society. I am disposed therefore to consider the declaration of the officers and members of the Grand Lodge, that the old system and the old name were abolished, and a new one established, as a simple dereliction or abdication or (if it will be more acceptable to the very respectable men concerned) resignationof their stations in the corporation. They intended indeed a great deal more $ for meaning well, and believing they possessed absolute power over the object, they meant to extinguish the corporation in order to establish another society, chartered or voluntary, on a broader basis. But they had not the power under the charter to do this, and their act in my judgment may be fairly said to be no more than a resignation ; and I think the subordinate Lodges, who originally created the Grand Lodge, and out of whose boP *580 SOm ^ £row» a right to renew the Grand Lodge by sending their past and present masters and the officers or proxies, to form a Grand Lodge, and to rhoose new grand officers. They have exercised this right, and I the new Grand Lodge and the subordinate Lodges' arr. re-established jn their full force, and in possession of ail the legal rights of the corporation. I will not go into a full examination of the question, whether the subordinate Lodges had a right to assemble in convention and expel the members whose conduct they disapproved. The regulations of the Aliiman Rezón on the subject of assembling in convention, were adapted to ordinary occasions. The proceedings of the Grand Lodge, supposing them irregular and untenable, as I have done, left the subordinate Lodges, who disapproved their conduct, and who were desirous to adhere to the charter, no other method of proceeding, in order to preserve themselves and to revive or (as the case Rex vs. Passmore expresses it) to restore the integral part of the corporation, which had been left vacant by resignation or dereliction. And I think they might lawfully revive it as they did. Nor do I think it necessary to examine minutely as to the numbers who concurred with the Grand Lodge. In such a question, which went to the existence of the society and charter, no representation or proxies could take away from the Lodges the power of judging for themselves as constituent parts of the corporation ; but allow the full system of representation, it had not proper powers for such a purpose, so that a majority of the Lodges never consented to these measures ; and if they did momentarily submit, they speedily, and whilst the measure was pending (the condition of the convention, to wit, the attainment of a new charter, never having been obtained,) expressed their disapprobation and disagreement, and no more than twelve Lodges out of thirty-nine adhere to the change attempted by the Grand Lodge. With respect to the individuals composing the Grand Lodge who acted the part complained of by the subordínate Lodges, it appears to me that they made so, *581 complete an abandonment of the society, such a tion of their interest in the charter, that tiicre was no necessity for their removal by any act of expulsion or amotion. But if it were necessary that they should be formally removed, it is well known that every society, every corporate body, has the power of amotion as incident to it. Though Lord Coke and some others formerly thought differently, the later cases have completely established that point. 2 Bar. 21, 2. But this power of amotion must be exercised with great caution and regularity, for the body of the corporation and the parties have a rigiit to be summoned, and have an opportunity of explaining their conduct and defending themselves. These provisions have not been followed in this case, for the parties had no notice, and if the matter rested here, I should say these individuals still remained members of the corporation; even though I might be satisfied that the. attempt to extinguish the corporation and to give up the charter, was a reasonable cause for amotion. But where an oilicer declares he will serve no longer, and had in other respects misdemeaned himself, and was removed without notice ; the Court of King's Bench refused a mandamus to restore him, the causes of removal appearing so sufficient. See Bex vs. Mayor and Burgesses of \xbridge, Cow. 532. I think the acts of the members composing the Grand Lodge, in declaring the Grand Lodge dissolved, (which they have produced in evidence) do amount to an express declaration that they would serve no longer, and is a voluntary and avowed abandonment of the charter and of the society. It was not a loose declaration, but a solemn act, published to the world, and since avowed to the Court; and they are bound by it. Their very suit in a different character proves this.
It will be perceiyed from the foregoing, that I am of opinion against the complainants on the merits of the cause. But if my judgment should have been misled in that respect, there is another ground on which it appears to me impossible that the complai- *582 nauts can sustain this suit. They have brought the aetion in the name of William Loughton Smith, John F. Grimke and others, officers and past masters of the Grand Lodge of South-Carolina, to recover a debt, contracted with and due to the Grand Lodge of South-Carolina Ancient York Masons. In their individual capacity they are clearly not entitled to the money nor can they maintain the suit. The Grand Lodge of South-Carolina is not a corporate body knowh to the law.. In neither character can they recover. It was insisted that here is only a slight alteration of the corporate' name, and that in some cases it has been decided that such slight variations shall not vitiate the claim or the suit. The rule is that suits shall be in the corporate name which is the bond which binds the society together; but there have been some instances in which the corporation has not been held to the strictness of a letter. Slight variations have not been allowed to defeat just demands, and I approve of that liberality which aids justice. But here the variation in the name is not a slight one, it omits the words which form the distinction and discriminating character of the corporation, « Ancient York Masons nor is this omission accidental, which the Court might remedy by allowing an amendment. It is done by design, on a settled plan fully executed and avowed even now, to abandon the use of the name given by the charter, and to abolish its use, and to assume a new one, in a distinct society composed of others besides the members originally or regularly members. And this too is a voluntary society, not an incorporated one. It does therefore appear to me that this was a radically designed change of name as well as of character. And that this new voluntary society of masons, forming the Grand Lodge of South-Carolina could not succeed to the rights of the corporation of South-Carolina Ancient York Masons, which they had voluntarily abandoned ; and still less that this suit could be maintained in their name as it is brought, even against the debtor, if the other defendants made no opposition. I admit *583 (that I may not be misapprehended) that a debt due to a corporation still remains though their name be cluing-ed by a new charter, (2d Bacon, 32, 3 ; Lev. 238,) this must be where the change has been regularly agreed to by the constituent parts of the corporation, and the new charter is actually obtained, and where it is obviously the same corporation somewhat new modelled, with their own full consent. It is not easy for a corporation to bo connected and succeed to the rights of a voluntary society out of which it grew, asjttay-beperceiv-ed in the case of Dance am(,-ethers vs. Girdler and others, in 1 Bos and Puller/page 34 ; and still less I apprehend can the individuals who belonged to a corporation, and even composed an integral part of it, but who have abandoned the society to form a new voluntary society, connect the rights of the old corporation with the new society. There were some minor points in the case, which I will notice from respect to the counsel who urged them. It has been stated that the fund in controversy was raised chiefly by the contributions of those Lodges which have adhered to the change made by the Grand Lodge in Charleston, and that the Lodges who adhered to the ancient charter had contributed but little to the fund. This may be and I believe is correct, but it cannot have any influence upon this cause, for whenever individuals or portions of a corporation quit the main body, they leave all the rights and funds of the corporation which remain in its perfect character. This is the legal effect and result, not from the decree of this or any other Court. It was also urged that the defendants had obtained the advantage of possessing the fund, by an order of a Judge of the Court of Common Pleas, changing the attorney, which was irregularly obtained. I have but one remark to make on that subject. If that order had been irregularly obtained, it could have been regularly reversed ; and I am bound by the respect mutually due by the Courts of Justice to each to other, to suppose that the order was properly obtained. Upon the whole, I am satisfied after a most deliberate examin *584 ation of this case, that the complainants are not entitled to recover on the merits of'.the cause ; and I am also satisfied that the individuals who have left an incorporated society and formed a voluntary one, cannot maintain a suit to recover the corporate funds, more especial-]yasthat corporation remains in my judgment, entire, and is in full possession of all its rights. It is therefore ordered and decreed, that the injunction be dissolved, and that the complainants’ bill be dismissed, hut without costs of suit.
Messrs. Bacot, Simons, Huger and Ford, for the complainants.
Messrs. Wilson, Geodes and Pringue for the defendants.
Henry Wiixiam Desaussure.
There was no appeal from this decree.